# United States District Court

### DISTRICT OF DELAWARE

UNITED STATES OF AMERICA

v.

Robert Cooke, Gwennette Bowman, and Kenneth Bowman



Criminal Complaint

CASE NUMBER: 05- 53 M - ALL

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

On or about  from mid-to-late February 2005 until March 17, 2005  in  Kent  County, in the District of Delaware, defendant(s) did knowingly conspire to distribute marijuana

(Track Statutory Language of Offense)

in violation of Title    21    United States Code, Section(s)  846 and 841 .

I further state that I am a(n)  Detective, Delaware State Police  and that this complaint is based
Official Title
on the following facts:

See attached Affidavit.

Continued on the attached sheet and made a part hereof:    Yes

Signature of Complainant
Darren Short
Detective, Delaware State Police

Sworn to before me and subscribed in my presence,

March 17, 2005                        at   Wilmington, DE
Date                                         City and State

Honorable Mary Pat Thynge
United States Magistrate Judge
Name & Title of Judicial Officer         Signature of Judicial Officer

1. Your Affiant is Detective Darren Short with the Delaware State Police Special Investigations Unit. Affiant Short has been employed with the Delaware State Police since November 13, 1993 and is currently assigned to the Special Investigations Unit. Affiant Short holds a Bachelor's Degree in accounting from Moravian College and has completed state and federal courses about identifying, abusing, manufacturing and distributing narcotic and non-narcotic controlled dangerous substances. Affiant Short's training includes a two-week basic drug investigator's school sponsored by the U.S. Department of Justice's Drug Enforcement Administration. Affiant Short has been an affiant or co-affiant in 95 search warrants in dangerous drug investigations. Affiant Short has essentially worked full time on dangerous drug cases for the last 6 ½ years.

2. During the last two weeks of February 2005, a cooperating individual, hereafter referred to as CI2, contacted Affiant Short. CI2 does not have a history as an informant, and therefore I have tried to tape record everything that CI2 does. My experience with CI2 to date is that CI2 has been accurate in CI2's descriptions, and I therefore believe that CI2 is reliable. CI2 advised that CI2 has been associated with Gwennette Bowman for several years and has purchased marijuana from her on several occasions since meeting Gwennette Bowman. CI2 advised that CI2 met Kenneth and Gwennette Bowman in Ken's Underground while getting a Tattoo. CI2 advised that during the meet they discussed marijuana, which lead to subsequent purchases of marijuana from Gwennette Bowman. CI2 took Affiant Short to the residence on Paradise Alley Road and pointed out the Bowmans' residence.

3. During the last two weeks of February 2005, Affiant Short was again contacted by CI2. CI2 advised that CI2 could purchase marijuana from Gwennette Bowman at her residence at ████████████████ Harrington, Delaware. CI2 performed a controlled purchase of a half ounce of marijuana from Gwennette Bowman inside her residence at ████████████████. The marijuana CI2 purchased was field-tested with a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

4. During the last two weeks of February 2005, Affiant Short was again contacted by CI2. CI2 advised that CI2 could purchase a quantity of marijuana from Gwennette Bowman at her residence at ████████████████, Harrington, Delaware. CI2 entered the residence and contacted Gwennette and Kenneth Bowman in the residence. CI2 was sold a quarter pound of marijuana in the residence by Gwennette Bowman in exchange for U.S. Currency. During the transaction CI2 spoke with the Bowmans about meeting their supplier of marijuana. Gwennette Bowman stated that her supplier was looking for someone to buy large quantities of marijuana from locally. Gwennette Bowman agreed to set up a meeting at her residence on February 25, 2005 so that CI2 could meet Robert Cooke. During this conversation, Ken Bowman vouched for Cooke's reliability in the marijuana distribution business. This conversation was audio recorded. The marijuana CI2 purchased was field-tested with

a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

5. On February 25, 2005, CI2 met with Gwennette Bowman and Robert Cooke at ███████████, Harrington, Delaware. Parts of the conversation were recorded and parts were not due to technical difficulties with the audio system. CI2 advised me of what was said between Gwennette Bowman, Robert Cooke and CI2. Robert Cooke was followed from BCP (a car dealership) Smyrna to his residence at ███████████, Dover, Delaware and then to the meeting at Paradise Alley Road.

6. During the meet on February 25, 2005, Robert Cooke advised that he sells approximately 14-30 pounds of marijuana a month and has been in the marijuana business for a long time dealing with a tight clientele. He advised that his partner was on his way to Connecticut to pick up twenty pounds of marijuana. He further advised that he is presently paying $1800-$1900 a pound. Robert Cooke advised that he would purchase marijuana from CI2 in bulk at $2000 a pound. Robert Cooke advised that he could purchase all 30 pounds in a 42-day growing cycle from CI2.

7. Also during the meet on February 25, 2005, Robert Cooke agreed to sell CI2 a half-pound of marijuana to hold CI2 over until CI2's crop was harvested. Robert Cooke stated that he would sell the marijuana to CI2 in the parking lot of the BCP car dealership in Smyrna. Robert Cooke gave CI2 his business card with his phone numbers on it. (Cell phone 302-███████). Gwennette Bowman drew a map on the back of the card to show CI2 where to park to do the transaction. Robert Cooke told CI2 that the location on the south end of the dealership is a safe location out of view of all the dealerships surveillance cameras. Gwennette Bowman vouched for CI2's marijuana and for CI2's credibility.

8. After CI2 had left the residence, Gwennette Bowman called CI2 and told CI2 that Robert Cooke was excited about dealing with CI2. Gwennette Bowman advised that she gave Robert Cooke a handgun after CI2 had left the residence.

9. On March 1, 2005, Affiant Short met with CI2. Affiant Short instructed CI2 to call Robert Cooke in reference to setting up a marijuana transaction for March 2, 2005. CI2 contacted Robert Cooke and set up the transaction for the next day. This conversation was audio taped.

10. On March 2, 2005, Affiant Short again met with CI2. CI2 and CI2's vehicle were searched and found to be free of drugs, money, and contraband. Affiant Short instructed CI2 to place a phone call to Robert Cooke to advise him that CI2 was close to the meet location. CI2 placed the phone call and Affiant Short audiotaped the conversation. Robert Cooke advised CI2 that he was at the car dealership and that he would meet CI2 on the south side of the dealership or inside. Affiant Short then supplied CI2 with thirteen hundred dollars U.S. currency and set up equipment to audio record the transaction. Detective Calloway set up to video and audio record

the transaction at the dealership. Affiant Short then followed CI2 to the car dealership and observed CI2 pull in next to Robert Cooke's Jeep Cherokee Delaware registration ~~~~~~~ that was parked on the south side of the dealership. CI2 met with Robert Cooke. Detective Calloway saw (and I have seen on the videotape) Robert Cooke remove a brown package from the passenger side of his vehicle and then get into the passenger side of CI2's vehicle. While it could not be seen, it could be heard that Robert Cooke then handed CI2 a quantity of marijuana and CI2 handed Robert Cooke the U.S. currency that I had supplied CI2.

11. They then had a conversation about Robert Cooke purchasing marijuana from CI2 in two weeks. Robert Cooke advised CI2 that he had already advised his clients who buy in bulk that he was trying a higher grade of marijuana and as a result his prices may have to be adjusted. Also during this conversation, Robert Cooke advised CI2 that he had a partner in his marijuana distribution and that his partner was a black male who mainly sells to lawyers and people in the music industry. Robert Cooke also discussed concealment methods for transporting large quantities of marijuana. Robert Cooke advised that he would be interested in buying 25-30 pounds of marijuana every 43-day cycle because that was about his normal flow. Robert Cooke told CI2 that he wanted as close to ten pounds as possible of marijuana on the first delivery. Robert Cooke advised that it would not be a problem for him to give CI2 $15000 to $20000 during the exchange. Robert Cooke further advised that he liked the idea of having a supplier close by to cut down on the risk of transporting large quantities of marijuana.

12. After the conversation, Robert Cooke exited the vehicle and CI2 exited the area. Affiant Short then followed CI2 to a predetermined location where Affiant Short met with CI2. CI2 turned over to me the brown bag containing the cracker box. The cracker box contained marijuana. The cracker box contained 8 individually packaged bags of marijuana. The marijuana was field-tested with a #9 KN Reagent for Marijuana, THC, and Hashish and a positive reaction was obtained. Affiant Short again searched CI2 and found him/her to be free of drugs, money, and contraband.

13. On March 9, 2005, Affiant Short instructed CI2 to call Robert Cooke to see if he still wished to purchase ten pounds of marijuana from CI2. CI2 placed the call and Robert Cooke advised that he would be able to purchase the marijuana the following week.

14. On March 16, 2005, CI2 called Gwennette Bowman to make sure that the ten pound sale would take place that day. Gwennette Bowman agreed to call Cooke to make sure the deal would occur because, she said, she was getting something (marijuana) from the deal. Cooke then called CI2, and agreed to meet CI2 at 2 p.m. to do the transaction, with the deal to occur at BCP Smyrna. Police then followed Cooke from his home to BCP Smyrna. CI2 was provided with ten pounds of marijuana (field tested by me before I gave it to CI2) to bring to the deal. It was packaged in a basket so that it would be concealed. At about 2:24 p.m., CI2 met with Cooke, and Cooke

placed the basket with the marijuana in the back of his 2004 Jeep Cherokee. Cooke gave CI2 $10,000 in cash. It was in ten $1,000 bundles. CI 2 left, and met with me. At that time, he turned over the $10,000, and I took off the wires that he had been using to record the conversation. Surveillance on Cooke followed him onto Rte 1. He was stopped on Rte. 1. The marijuana was located in the back of the truck, where we had seen him place it. We also located about one-half ounce of marijuana in the center console. He also had $2,200 in the center console, which we seized.

15. Cooke gave a taped Mirandized statement. Among other things, he said that he supplied Gwennette Bowman with marijuana, that he had thought about walking away from this deal, but that Gwennette Bowman pushed him to complete it.

16. During a search of Cooke's house on March 16, 2003, police seized about 2 ½ pounds of marijuana (field tested positive for marijuana).

17. During a search of the Bowmans's house, police recovered about a half ounce of marijuana, field tested positive for marijuana.

18. Kenneth Bowman gave a taped Mirandized statement. Among other things, he said that he tries not to touch the marijuana when a transaction happens. He said he is often there when the transactions happen, but that Gwennette is the one who handles the marijuana.

19. Gwennette Bowman told another detective on the morning of March 17, 2005, that her supplier is Robert Cooke, and that she does not buy pounds from him, but rather ounces.

20. Based upon the information contained herein, it is the belief of your affiant that probable cause does exist to believe that Robert Cooke, Gwennette Bowman, and Kenneth Bowman conspired to distribute marijuana during the time period from mid- to-late February 2005 from March 17, 2005, in violation of 21 U.S.C. §§846 and 841.

Det. Darren Short
Del. State Police

Sworn to and subscribed before me this 17th day of March, 2005.

Honorable Mary Pat Thynge
United States Magistrate Judge
District of Delaware